## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| LONDON COMPUTER SYSTEMS, INC., | : | Case No. 1:18-cv-696 |
| | : | |
| | : | Judge Timothy S. Black |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| ZILLOW, INC., | : | |
| | : | |
| Defendant. | : | |

## ORDER DENYING PLAINTIFF'S RENEWED
## MOTION FOR A PRELIMINARY INJUNCTION (Doc. 58)

This civil action is before the Court on Plaintiff London Computer Systems, Inc.

("Plaintiff")'s renewed motion for a preliminary injunction against Defendant Zillow,

Inc. ("Defendant") (Doc. 58) and the parties' responsive memoranda. (Docs. 64, 68, 71).

## I.  BACKGROUND

This is a trademark dispute.  Plaintiff, the owner of a property management

product called "RENT MANAGER," has filed suit against Defendant, the owner of a

property management tool called "ZILLOW Rental Manager," under the Lanham Act,

the Ohio Revised Code, and the Ohio common law.  (*See* Doc. 1).  Plaintiff has held a

federally registered trademark in the term "RENT MANAGER" since September 9,

2008.  (Doc. 2-3 at 55).  And Plaintiff claims that Defendant's use of the name "ZILLOW

Rental Manager" infringes on that registration.[1]  (*See* Doc. 1).

---

[1] Throughout this Order, the Court uses all caps to denote which portions of the parties' competing names are trademarked.

*Infra*, the Court discusses: (A) Plaintiff and its product; (B) Defendant and its tool; and (C) the events giving rise to this dispute.  Thereafter, the Court turns to the law.

## A. Plaintiff and RENT MANAGER

Plaintiff is an Ohio corporation headquartered in Cincinnati.  (Doc. 2-2 at ¶ 2). Plaintiff "is a developer of business-critical software technologies."  (*Id.*)  Plaintiff's business-critical software technologies are "used in all 50 states and several markets throughout the world."  (*Id.*)

Plaintiff's primary product is called RENT MANAGER.  (*Id.* at ¶ 3).  Plaintiff first developed RENT MANAGER in 1988.  (Doc. 59 at 6).  And Plaintiff continues to sell RENT MANAGER today.  (*Id.*)  Plaintiff registered the RENT MANAGER mark with the United States Patent Office (the "USPTO") in 2008.[2]  (*Id.* at 9).  Since its registration with the USPTO, the RENT MANAGER mark has become incontestable.[3] (Doc. 2-2 at ¶ 5).

By Plaintiff's definition, RENT MANAGER is an "advanced, customizable, and scalable" property management software that "combines all the features [a property manager] need[s] to run a real property business into one integrated solution."  (Doc. 2-2 at ¶ 4; *see also* Doc. 60-2 at 6 (stating that RENT MANAGER helps landlords with

---

[2] Notably, it took Plaintiff two tries to register the RENT MANAGER mark with the USPTO. (*See* Docs. 11-13, 11-14).  The USPTO rejected Plaintiff's first attempt, as the USPTO viewed the mark as "merely descriptive" of Plaintiff's goods.  (Doc. 11-13 at 2).  The USPTO accepted Plaintiff's second attempt, as Plaintiff submitted a declaration swearing that continuous use had rendered the mark distinctive.  (Doc. 11-14 at 2).

[3] A mark achieves incontestable status after it has not been successfully challenged within five years of its registration.  *See* 15 U.S.C. § 1065.

"listing and marketing properties, screening and accepting applications . . . , collecting rent, completing work orders . . . , and more").

RENT MANAGER offers 18 "core services" to its users. (Doc. 59 at 16; Doc. 60-2 at 53). These are: complete accounting system, work order management, VOIP phone integration, reporting, open API, owner web access, commercial module, prospect manager, loan manager, metered utilities, tenant web access, ePay processing, eChecks, website integration, property listing, leasing applications, tenant screening, and online lease payments. (Doc. 59 at 16; Doc. 60-2 at 53).

Plaintiff sells RENT MANAGER in either a stand-alone format or an online format. (Doc. 59 at 17). The stand-alone format sells for a one-time fee of $5,000–$6,000. (*Id.* at 18). The online format sells for a monthly fee of $75 (plus a one-time activation fee of $150). (*Id.*) Consumers can access RENT MANAGER through either a desktop computer or a mobile app. (Doc. 58-1 at 13). To purchase RENT MANAGER, a consumer must call Plaintiff and speak to a sales rep. (Doc. 59 at 17).

Currently, RENT MANAGER has about 37,000 users. (Doc. 59 at 20; Doc. 60-2 at 6). RENT MANAGER's users generally include landlords who manage between 50 and 10,000+ rental units. (Doc. 59 at 18). Smaller property managers can and do use RENT MANAGER. (*Id.* at 18–19). But, given the price of Plaintiff's product, using RENT MANAGER may not always be cost efficient for landlords with only one or two rentals. (*See id.*).

Plaintiff markets RENT MANAGER, *inter alia*, through search engine optimization, via online- and print-based advertisements, and at trade shows. (*Id.* at 17).

Plaintiff's marketing efforts target both bigger and smaller property managers.  (Doc. 59 at 19).  Since 1988, Plaintiff has expended "millions of dollars" advertising RENT MANAGER.  (Doc. 2-2 at ¶ 4; Doc. 60-2 at 6).  Also since 1988, Plaintiff has received various industry awards.  (Doc. 2-2 at ¶¶ 2–3).

Plaintiff's presents RENT MANAGER in the market as such:

| Plaintiff's website | Plaintiff's mobile app |
|:---:|:---:|



(Doc. 11 at 6; Doc. 11-18 at 2).

## B.  Defendant and ZILLOW Rental Manager

Defendant is a Washington corporation headquartered in Seattle.  (Doc. 1 at ¶ 6). Defendant operates the United States' leading real estate and rental marketplace.  (Doc. 70 at ¶ 5).  Defendant provides its consumers with a "complement" of online tools to help them in "the full life cycle of owning and living in a home . . . ."  (*Id.*)

In 2011, Defendant acquired a property management tool called "Postlets," which helped property managers post rental listings online.  (Doc. 61 at 26; Doc. 70 at ¶ 15). Then, in 2015, Defendant decided to rebrand the Postlets tool.  (Doc. 70 at ¶ 16). Accordingly, Defendant assembled a marketing team to do so.  (*Id.*)  The marketing team

included, *inter alia*, an individual named Krista Place.  (*Id.*)  Notably, Ms. Place had previously coordinated with Plaintiff on a few business matters.[4]  (Doc. 72 at ¶¶ 9–10).

Defendant's marketing team considered several new names for the Postlets tool, each of which paired Defendant's house mark (ZILLOW) with a "descriptor of the tool." (Doc. 70 at ¶ 17).  In the end, the marketing team chose ZILLOW Rental Manager.  (*Id.*) Ms. Place avers that the marketing team chose ZILLOW Rental Manager to "accurately describe the tool"—*i.e.*, to convey that it was "a tool from Zillow to help landlords with rental management."  (Doc. 72 at ¶¶ 4–5).

After choosing the name, ZILLOW Rental Manager, Defendant's marketing team ran the name past Defendant's legal team.  (Doc. 39 at ¶ 18).  The legal team advised the marketing team that the name was safe to use.  (*Id.* at ¶ 19).  The legal team did not base its advice on a trademark search.  (*Id.*; Doc. 61 at 125).  Instead, the legal team reasoned that, as "Rental Manager" was an "incredibly descriptive term," it "would be very difficult" for any party (including Defendant) "to claim rights in it."  (Doc. 39 at ¶ 19).

Defendant introduced ZILLOW Rental Manager to its consumers in January 2016. (Doc. 70 at ¶¶ 9–10).  Defendant generally provides the tool to non-multifamily users for free.  (*Id.*)  Upon introduction, the tool only offered one feature.  (Doc. 60-2 at 28).  It helped users post rental listings online.  (*Id.*)  But, in July 2018, Defendant expanded the tool's functionality.  (*Id.* at 30).  Thus, at present, the tool also allows users to: manage

---

[4] More specifically, Ms. Place had previously coordinated with Plaintiff on certain listing matters and had previously presented with Plaintiff at a webinar.  (*See* Doc. 70 at ¶¶ 16, 25; Doc. 72 at ¶¶ 9–10).

rental applications; screen prospective tenants; and accept online rental payments. (*Id.*)

Users can access ZILLOW Rental Manager through either a desktop computer or a mobile app. (Doc. 70 at ¶¶ 11, 23). ZILLOW Rental Manager was created to appeal to landlords who manage a small number—*i.e.*, one or two—rental properties. (Doc. 30 at 64–65; *see also* Doc. 58-1 at 15 (stating that "[ZILLOW Rental Manager] users are primarily landlords and/or property managers of a single unit/house . . .")). But, that said, some multifamily property managers do use the tool. (Doc. 30 at 81–82).

Defendant markets ZILLOW Rental Manager, *inter alia*, through search engine optimization, via online- and print-based advertisements, and at trade shows. (Doc. 30-4 at 11, 14). Defendant's advertisements target landlords who own properties in buildings with fewer than 50 units. (Doc. 39 at ¶ 10). Defendant always markets ZILLOW Rental Manager such that its house mark (ZILLOW) precedes the tool's name (Rental Manager). (Doc. 70 at ¶¶ 6, 11; *accord* Doc. 60-2 at 5).

Defendant presents ZILLOW Rental Manager in the market as such:

| *Defendant's website* | *Defendant's mobile app* |
|---|---|
|  | |

(Doc. 11-4 at 2; Doc. 11-6 at 2).

### C. Events Leading Up to This Dispute

Although Defendant introduced ZILLOW Rental Manager in January 2016, Plaintiff did not learn about ZILLOW Rental Manager until July 2018—when Plaintiff received a press release (the "July 2018 press release") advertising the tool's newly-expanded ability to: manage rental applications; screen prospective tenants; and accept online rental payments. (*See* Doc. 59 at 6; Doc. 70 at ¶ 9; *see also* Doc. 58-1 at 14–15; Doc. 60-2 at 30 (containing a copy of the July 2018 press release)).

After Plaintiff received the July 2018 press release, Plaintiff's counsel sent Defendant's counsel a cease and desist letter, instructing Defendant to stop using the name ZILLOW Rental Manager. (Doc. 2-3). Defendant did not respond to the cease and desist letter, so Plaintiff filed this civil action.[5] (*See* Doc. 2-2 at ¶ 8; *see also* Doc. 1).

In its Complaint, Plaintiff alleges that, by using the name ZILLOW Rental Manager, Defendant has infringed upon its federally registered trademark—*i.e.*, RENT MANAGER. (Doc. 1 at ¶¶ 1, 15–55). Plaintiff's asserts claims for: trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a); unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); deceptive trade practices under Ohio statutory law, Ohio Rev. Code § 4165.02; and unfair competition under Ohio common law.[6] (*Id.* at ¶¶ 16–44). Plaintiff seeks injunctive and monetary relief. (*Id.* at 11–15).

---

[5] Defendant avers that it never received the cease and desist letter. (Doc. 70 at ¶¶ 24–25).

[6] Plaintiff also asserts claims for an accounting, a constructive trust, and unjust enrichment. (Doc. 1 at ¶¶ 45–47, 51–55). But those claims are not at issue in the instant motion. (Doc. 58).

7

In connection with its Complaint, Plaintiff filed a motion for a temporary restraining order and preliminary injunction.  (Doc. 2).  However, after Plaintiff filed that motion, the parties agreed to engage in certain limited discovery.  (*See* Doc. 68 at 8–9).

Once the parties' limited discovery was complete, Plaintiff filed a renewed motion for a preliminary injunction (the "PI Motion").[7]  (Doc. 58).  Defendant responded, Plaintiff replied, and Defendant sur-replied.  (Docs. 64, 68, 71).  In the PI Motion, Plaintiff asks the Court to enjoin Defendant from "[d]irectly or indirectly using the [RENT MANAGER] mark or any mark similar thereto including, but not limited to, '[ZILLOW Rental Manager],' in connection with the rendering of any unauthorized services or the sale of any unauthorized goods . . . ."[8]  (Doc. 58 at 1).

After the PI Motion was filed, the parties submitted several motions regarding the exclusion of expert testimony and the sealing of confidential documents.  (Docs. 34, 48, 51, 66).  The Court has resolved those motions by way of appropriate Orders.  (Docs. 56, 73, 74).  Also after the PI Motion was filed, the parties agreed that the Court could issue a decision on the PI Motion without holding an evidentiary hearing.  (Not. Order, Nov. 27, 2018).  As such, the PI Motion is ripe for adjudication.[9]

---

[7] As Plaintiff filed the renewed motion for injunctive relief (Doc. 58), the Court **TERMINATES** the original motion for injunctive relief (Doc. 2) as **MOOT**.

[8] Plaintiff also asks the Court to enjoin Defendant from using any mark, making any representation, or taking any action, which may cause consumers to believe that the parties are somehow affiliated, or that constitutes the wrongful use of Plaintiff's goodwill.  (Doc. 58 at 1–2).

[9] Each party has submitted expert testimony.  Plaintiff has proffered the testimony of Rebecca Reczek, Ph.D. ("Plaintiff's expert"), a marketing expert (*see* Doc. 60); and Defendant has proffered the testimony of Jeffery Stec, Ph.D. ("Defendant's expert"), a survey expert (*see* Doc. 62).  The Court will discuss the experts' testimony herein when/as appropriate.

## II.  STANDARD OF REVIEW

Plaintiff bears the heavy burden of demonstrating its entitlement to injunctive relief.  An "injunction is an **extraordinary remedy** which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (emphasis added).

In determining whether to grant injunctive relief, this Court must weigh four factors: (A) whether the moving party has shown a strong likelihood of success on the merits; (B) whether the moving party will suffer irreparable harm if the injunction is not issued; (C) whether the issuance of the injunction would cause substantial harm to others; and (D) whether the public interest would be served by issuing the injunction.  *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526–27 (6th Cir. 2017).  These four considerations are factors that must be balanced, not prerequisites that must be met. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc*., 119 F.3d 453, 459 (6th Cir. 1997). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

## III.  ANALYSIS

### A.  Likelihood of Success

The first preliminary injunction factor is whether Plaintiff has established a strong likelihood of success on the merits.  In its Complaint, Plaintiff alleges that, by using the name ZILLOW Rental Manager, Defendant has committed trademark infringement,

deceptive trade practices, and unfair competition. (Doc. 1 at ¶¶ 16–44). The parties agree that the legal standard applicable to Plaintiff's trademark infringement claim also governs Plaintiff's deceptive trade practices and unfair competition claims. (Doc. 58-1 at 17; Doc. 68 at 13 n.2). As such, the legal standard applicable to Plaintiff's trademark infringement claim will guide the Court's following analysis.

To prevail on a trademark infringement claim, the plaintiff must "establish that [the defendant]'s trademark creates a likelihood of confusion regarding the origin of goods . . . offered by the respective parties."[10] *Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 424 (6th Cir. 2017); *see also Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) ("The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.").

The Sixth Circuit has recognized four different theories of trademark infringement: palming off; confusion of sponsorship; reverse confusion of sponsorship; and dilution. *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964–65 (6th Cir. 1987). Plaintiff avers that "this case includes 'reverse confusion'" (Doc. 58-1 at 23), which has been described as follows:

> In a reverse confusion of sponsorship suit, the plaintiff's action rests on the claim that the junior user of a mark is saturating the market with advertising bearing the mark, thereby causing

---

[10] The plaintiff must also establish that it owns a valid trademark. *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013). For the purposes of this Order, the Court will assume without deciding that Plaintiff owns a valid trademark which has not become generic.

> consumer confusion.    Specifically, consumers mistakenly
> believe that the senior user's products are the junior user's or
> that the senior user is somehow connected with the junior user.
> The evil in this kind of confusion is that the "senior user loses
> the value of the trademark—its product identity, corporate
> identity, control over its goodwill and reputation, and ability to
> move into new markets."

*Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1455 (S.D. Ohio 1990)

(quoting *Ameritech*, 811 F.2d at 964) (citations omitted).

Regardless of the theory of trademark infringement alleged, courts within the

Sixth Circuit consider the following eight factors to determine whether a likelihood

of confusion exists: (1) strength of the plaintiff's mark; (2) relatedness of the goods;

(3) similarity of the marks; (4) evidence of actual confusion; (5) defendant's intent in

selecting the mark;  (6) marketing channels used; (7) likely degree of purchaser care; and

(8) likelihood of expansion of the product lines (collectively, the "*Frisch's* factors").

*Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th

Cir. 1982); *see Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 630 (6th Cir.

2002).

Not all of these factors will be relevant in every case, and, as such, the plaintiff

need not establish each factor to prevail.  *Leelanau Wine Cellars, Ltd. v. Black & Red,*

*Inc.*, 502 F.3d 504, 515 (6th Cir. 2007); *accord Kellogg Co. v. Exxon Corp.*, 209 F.3d

562, 568 (6th Cir. 2000).  In every case, the ultimate question remains "whether relevant

consumers are likely to believe that the products . . . offered by the parties are affiliated in

some way."  *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100,

1107 (6th Cir. 1991); *accord CFE Racing Prod., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 592 (6th Cir. 2015).

With the foregoing in mind, the Court addresses each of the eight *Frisch's* factors in turn. Then, the Court balances them to arrive at its conclusion regarding likelihood of success on the merits.

### 1. *Factor one: strength of the plaintiff's mark*

Stronger marks are entitled to greater protection. *Leelanau*, 502 F.3d at 515; *see also Progressive*, 856 F.3d at 431 (referencing *Ameritech*, 811 F.2d at 966). To determine whether a mark is "strong," a court must consider its conceptual and commercial strength. *See Progressive*, 856 F.3d at 428. Conceptual strength refers to whether a mark is <u>distinctive</u>. *See id.* Commercial strength refers to whether a mark is <u>well-known</u>. *See id.* "[T]he true relative strength of a mark can only fully be determined by weighing [both] aspects of strength." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 420 (6th Cir. 2012) (citation omitted); *accord Rohn v. Viacom Int'l Inc.*, 706 F. App'x 319, 320 (6th Cir. 2017).

#### a. <u>Conceptual strength</u>

##### i. *Inherent distinctiveness*

The first step in the conceptual strength analysis is to classify the mark at issue as either generic, descriptive, suggestive, or arbitrary/fanciful. *See Progressive*, 856 F.3d at 428; *Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x 553, 556 (6th Cir. 2013). This classification encapsulates the mark's "inherent distinctiveness." *Lucky's*, 533 F. App'x at 556; *Maker's*, 679 F.3d at 419. Generic and descriptive terms lack inherent

distinctiveness and are considered conceptually weaker, whereas suggestive and arbitrary/fanciful terms have inherent distinctiveness and are considered conceptually stronger. *See Daddy's*, 109 F.3d at 280, 282; *see also Ward v. Knox Cty. Bd. of Educ.*, 612 F. App'x 269, 272 (6th Cir. 2015).[11]  Of these categories, the two at issue in this Order are descriptive and suggestive.[12]

A descriptive term describes: "the intended purpose, function or use of the goods . . . ; a desirable characteristic of the goods; or the end effect upon the user." *Ward,* 612 F. App'x. at 273 (citation omitted).  For example, "SCHOOL COUPONS" is a descriptive term, as it describes coupons sold in schools. *Id*.  By contrast, a suggestive term "*suggests* rather than <u>describes</u> an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc*., 78 F.3d 1111, 1117 (6th Cir. 1996) (citation omitted and emphasis added).  For example, "CITIBANK" is a suggestive term, as it connotes an urban or modern bank. *Id.*

Here, Plaintiff argues that RENT MANAGER is a suggestive mark (and thus conceptually strong). (Doc. 58-1 at 20).  More specifically, Plaintiff claims that the term RENT MANAGER merely "suggests rather than directly describes" the characteristics of Plaintiff's product. (*Id.*)  At this juncture, the Court finds Plaintiff's argument

---

[11] *See generally* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, at §§ 11:1, 11:80 (5th ed. 2020).

[12] As stated in n.10 *supra*, for the purposes of this Order, the Court will presume without deciding that RENT MANAGER has not become generic.  Neither party claims that RENT MANAGER is arbitrary/fanciful. (*See* Docs. 58-1, 64, 68, 71).

unpersuasive.

The words "rent" and "manager" are easily defined. The word "rent" has two definitions. When used as a noun, "rent" refers to "a tenant's regular payment to a landlord for the use of property." *Rent*, New Oxford American Dictionary (3d ed. 2010). When used as a verb, "rent" refers to the act of "let[ting] someone use (something) in return for payment." *Id*. The word "manager" also has two definitions. In the office world, "manager" means "a person responsible for controlling or administering all or part of a company." *Manager*, New Oxford American Dictionary (3d ed. 2010). In the computing world, "manager" means "a program or system that controls or organizes a peripheral device or process." *Id.*

Taking these definitions together, the plain meaning of the term "rent manager" is a person, program, or system that controls or organizes lease payments or the act of leasing properties. *Rent*, New Oxford American Dictionary (3d ed. 2010); *Manager*, New Oxford American Dictionary (3d ed. 2010). This plain meaning perfectly describes, rather than *suggests*, the overarching characteristics of Plaintiff's product. *Champions*, 78 F.3d at 1117. Indeed, by Plaintiff's definition, RENT MANAGER is a comprehensive property management software that helps landlords with "listing and marketing properties, screening and accepting applications . . . , collecting rent, completing work orders . . . , and more."[13] (Doc. 58-1 at 21 (citing Doc. 60-2 at 6)).

---

[13] Notably, and as stated in n.2 *supra*, when Plaintiff first tried to register RENT MANAGER with the USPTO, the USPTO refused Plaintiff's application on the basis that the mark was "merely descriptive" of Plaintiff's goods. (Doc. 11-13 at 2).

Accordingly, based on the information before the Court, RENT MANAGER is a descriptive mark, and, therefore, any finding of conceptual strength cannot be based on inherent distinctiveness alone.

### ii. *Incontestable status*

While the Court has concluded that RENT MANAGER is not inherently distinctive, this conclusion, alone, is not dispositive of the Court's conceptual strength analysis. The Court must also address the consequence of RENT MANAGER's incontestable status.[14]  (Doc. 2-2 at ¶ 5).  A mark achieves incontestable status after "it has not been successfully challenged within five years of its registration." *Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016).  Under Sixth Circuit precedent, an inherently descriptive mark that has achieved incontestable status is presumed to be conceptually strong. *Id.*; *Daddy's*, 109 F.3d at 282 (confirming that "incontestable status benefits those marks which otherwise would lack inherent strength . . .").

"However, a party may rebut th[is] presumption of strength and show that a mark is not distinctive by presenting evidence of 'extensive third[-]party use of [the mark or] similar marks [in the relevant market].'"[15]  *Progressive*, 856 F.3d at 429 (quoting *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 794 (6th Cir. 2004)).  "Third-party use

---

[14] Both parties agree that, since its registration in 2008, RENT MANAGER has achieved incontestable status.  (Doc. 58-1 at 10; Doc. 68 at 13).

[15] Notably, early Sixth Circuit precedent characterized an incontestable mark as strong, without further analysis or distinction between conceptual and commercial strength. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir. 1988).  However, more recent Sixth Circuit decisions have specified that an incontestable mark enjoys a *rebuttable presumption* of conceptual strength.  *Kibler*, 843 F.3d at 1073; *AutoZone*, 373 F.3d at 794.

weakens a mark because the mark is not an identifier for a single source." *Id.* In other words, by using the mark, "third parties [] muddle[] the mark's source." *Id.*; *accord Citizens Banking Corp. v. Citizens Fin. Grp., Inc.*, 320 F. App'x 341, 346–47 (6th Cir. 2009) ("[Third-party] use of [a] mark throughout the state, country, and on the internet weakens the strength of the mark.").

Here, in its opposition to the PI motion, Defendant has presented the Court with evidence of third-party use (albeit not couched as rebuttal evidence). (*See* Doc. 68 at 25; *see also* Doc. 69). If ultimately found persuasive, this evidence of third-party use would rebut RENT MANAGER's presumption of strength and indicate that RENT MANAGER is conceptually weak.

Defendant's evidence establishes that several third parties use the term "Rent Manager" (and/or its close variations) to promote property management products online. (*See* Doc. 69). Plaintiff correctly notes that some of the evidence Defendant has submitted is of limited value because it regards property management products that exist in other countries/industries. (Doc. 64 at 6–7, 9–10). But, even so, upon a review of Defendant's evidence, a few of the property management products featured are both in the relevant market and strikingly similar to RENT MANAGER. (*See* Doc. 69). As one example, Defendant proffers "Property Rent Manager," a digital platform that allows "landlord[s] to manage easily [their] rental properties in a new intelligent way." (*Id.* at 43–48). As another example, Defendant proffers "Rental Manager," an electronic application that "contains the necessary functions you need to manage your Rental

Property."[16] (*Id.* at 65–69).

While the evidence presented of third-party use is not overwhelming at this time, this case is still in the early stages of the litigation process, and there is no indication that Defendant's list of third-party uses was meant to be exhaustive. Moreover, "there does not appear to be a specific number of third-party uses that are sufficient [for rebuttal purposes]; rather, context matters." *Progressive*, 856 F.3d at 429. All things considered, for the purposes of this preliminary Order, the Court concludes that Defendant's evidence is sufficient to indicate its likely success in rebutting RENT MANAGER's presumed conceptual strength.

And such, based upon the evidence presented at this juncture, RENT MANAGER is conceptually weak, as RENT MANAGER is an inherently descriptive term, and Defendant is likely able to rebut the mark's presumption of conceptual strength.

b. Commercial strength

With conceptual strength addressed, the Court turns to commercial strength. "A mark's commercial strength depends on public recognition, the extent to which people associate the mark with the product it announces." *Kibler*, 843 F.3d at 1074. Survey evidence is the most persuasive evidence of commercial strength. *Maker's*, 679 F.3d at 421. That said, survey evidence is not required to establish that a mark is well-known.

---

[16] (*See also* Doc. 69 at 53–59 (depicting "Rental Property Manager Software," a software program that helps landlords "view[] outstanding payments," maintain "[a]ccurate recordkeeping," "advertise [rental] vacancies," etc.); *cf. id.* at 23–27 (depicting website for "Indy Rent Manager," a "property management firm" that offers marketing, screening, and leasing services)).

17

*Id.* Proof that a mark enjoys "'extensive marketing' and 'widespread publicity'" may evidence commercial strength. *Kibler*, 843 F.3d at 1074 (quoting *Maker's*, 679 F.3d at 421). Conversely, proof that third parties use the mark extensively in the relevant market may indicate the opposite. *Progressive*, 856 F.3d at 430.

Here, Plaintiff has not provided the Court with the most persuasive evidence of public recognition—survey evidence. *Cf. Kibler*, 843 F.3d at 1074. Instead, Plaintiff argues that RENT MANAGER is "well-known" (and thus commercially strong), because: it has spent "millions of dollars" on advertising over the past 30 years; it has regularly hosted an annual user conference and appeared as a sponsor at industry trade shows; and it has received various industry awards/rankings. (Doc. 58-1 at 31). On the Court's review, Plaintiff's evidence indicates that RENT MANAGER enjoys *some* degree of public recognition; however, Plaintiff's evidence does not establish that RENT MANAGER is commercially <u>strong</u>, for at least three reasons. *Cf. Kibler*, 843 F.3d at 1075 (confirming that "*some* proof [of publicity] is not enough" to establish commercial strength (emphasis in original)).

First, the fact that Plaintiff has spent "millions of dollars" on advertising over the course of 30 years is of limited value. (Doc. 58-1 at 31). The Sixth Circuit has specifically stated that "advertising budgets" bear only "an attenuated link to actual market[place] recognition . . . ." *Homeowners*, 931 F.2d at 1108. As such, a plaintiff cannot establish commercial strength simply by presenting the Court with substantial-sounding advertising figures. *See, e.g.*, *Progressive*, 856 F.3d at 423, 430 (refusing to conclude that commercial strength existed merely because a plaintiff had spent

approximately $2.5 million on advertising over the course of 20 years); *Homeowners*, 931 F.2d at 1107–08 (refusing to conclude that commercial strength existed merely because a plaintiff had spent over $7 million on advertising over the course of nine years); *accord* McCarthy, *supra,* at § 11:81.[17]

Second, Plaintiff's evidence that it regularly hosts an annual user conference and appears as a sponsor at industry trade shows does not establish widespread publicity. (Doc. 58-1 at 31). To be sure, this evidence certainly suggests that Plaintiff's mark enjoys *some* clout with respect to a *particular* type of property manager—*i.e.*, one who attends industry-specific user conferences and trade shows. But the evidence presented thus far does not establish that Plaintiff's mark is well-known with respect to other consumers in the broader property management industry.[18] *Cf. Homeowners*, 931 F.2d at 1108 (questioning the existence of commercial strength, where it appeared that the plaintiff's mark was only recognized by a "narrow universe" of professionals "who purchase[d] specialized commercial products from [the plaintiff]"); *Safe Auto Ins. Co. v. State Auto. Mut. Ins. Co.*, No. 2:07-CV-1121, 2009 WL 3150328, at *9 (S.D. Ohio Sept. 30, 2009) (same).

---

[17] *Cf.* McCarthy, *supra*, at § 11:81 (stating that, if a trademark owner chooses to rely on advertising figures to establish the strength of its mark, the trademark owner should put the "advertising figures in perspective by comparing them to the . . . advertising figures for similar products to show that [its] mark is relatively strong in its category").

[18] Moreover, while Plaintiff's expert has opined that RENT MANAGER is strong because, in 2018, Plaintiff's annual conference drew over 800 attendees, (Doc. 60-2 at 6), neither Plaintiff nor its expert has provided the Court with the comparative evidence needed to establish whether such a turnout constitutes a well-attended conference in the applicable industry.

Finally, the industry awards/rankings cited in Plaintiff's motion are insufficient to show widespread publicity. (Doc. 58-1 at 31). Upon review, most such awards/rankings appear to have been given to *Plaintiff* rather than RENT MANAGER. (*See* Doc. 2-2 at ¶ 2 (stating that "LCS [*i.e.*, Plaintiff] has been widely recognized and received awards for the organization's industry, employment, and community related efforts," and going on to list awards such as: a "Distinguished Employer Award," from the Ohio Cooperative Education Association; a "Bronze Stevie Award for Customer Service Department of the Year," from the American Business Awards; and a "Tech Team of the Year Finalist," from the Cincinnati Business Courier Innovation & Technology Awards)).[19] The fact that *Plaintiff* has received acclaim through the receipt of awards/rankings does not necessarily mean that RENT MANAGER enjoys the same level of renown.[20]

In the end, while the evidence presented indicates that RENT MANAGER enjoys *some* degree of public recognition, the evidence presented does not establish that RENT MANAGER is commercially strong.

### c. Overall strength

Upon a consideration of the evidence presented at this juncture, the Court cannot conclude that RENT MANAGER is a particularly strong mark from either a conceptual

---

[19] Notably, while Plaintiff argues that RENT MANAGER is regularly ranked as a top property management product (Doc. 58-1 at 31), the only specific evidence the Court has been able to find in support of this argument is a ranking from what appears to be a single industry-specific publication. (Doc. 60-3 at 32–50; Doc. 60-4 at 1–30); *cf. Homeowners*, 931 F.2d at 1108.

[20] To the extent that the awards cited *have* brought acclaim to both Plaintiff and RENT MANAGER, Plaintiff has not provided the Court with such evidence.

or a commercial standpoint.  As such, the first *Frisch's* factor weighs against finding a likelihood of confusion.

### 2.  *Factor two: relatedness of the goods*

The Sixth Circuit has "established three benchmarks regarding the relatedness of parties' goods and services."  *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003).  "First, if the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; finally, if the products are unrelated, confusion is highly unlikely."  *Id.*  "The relatedness inquiry therefore focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company."  *Therma-Scan*, 295 F.3d at 633 (quotation marks and citation omitted).

Here, Plaintiff argues that RENT MANAGER and ZILLOW Rental Manager are virtually "identical" systems that compete directly in the relevant market.  (Doc. 58-1 at 29–30).  Plaintiff bases this argument on the fact that both RENT MANAGER and ZILLOW Rental Manager offer "software that assists real estate property owners, landlords, and property managers with the management of real property . . . ."  (*Id.* at 30).  On the evidence presented, the parties' offerings are certainly related.  After all, both are property management systems, and both exist in the property management industry.

Nevertheless, on the evidence presented, the Court cannot conclude the parties' offerings are direct competitors.  This is true for three reasons.

First, on the record presented, RENT MANAGER is a far more comprehensive system than ZILLOW Rental Manager.  RENT MANAGER offers _18_ "core services" to its users: complete accounting system, work order management, VOIP phone integration, reporting, open API, owner web access, commercial module, prospect manager, loan manager, metered utilities, tenant web access, ePay processing, eChecks website integration, property listing, leasing applications, tenant screening, and online lease payments.  (Doc. 59 at 16; Doc. 60-2 at 53).  ZILLOW Rental Manager, on the other hand, offers only _four_: property listing, leasing applications, tenant screening, and online lease payments.  (Doc. 60-2 at 53).  Doubtlessly, there is overlap between the systems' features.  But, nonetheless, the fact remains that Plaintiff's system is far more comprehensive than Defendant's.  This distinction cuts against a finding of direct competitiveness.

Second, on the record presented, RENT MANAGER typically appeals to larger consumers than does ZILLOW Rental Manager.  RENT MANAGER's users generally include landlords who manage between 50 and 10,000+ rental units.  (Doc. 59 at 18).  By contrast, ZILLOW Rental Manager was created to appeal to landlords who manage a small number—_i.e._, one or two—rental properties.  (Doc. 30 at 64–65; _see also_ Doc. 58-1 at 15 (stating that "[ZILLOW Rental Manager] users are primarily landlords and/or property managers of a single unit/house . . .")).  And, while some smaller consumers use RENT MANAGER and some multifamily consumers use ZILLOW Rental Manager, on

the evidence presented, the systems' <u>typical</u> users remain largely distinct. (*See* Doc. 30 at 64–65, 81–82; Doc. 39 at ¶ 10; Doc. 56 at 18–19). This difference in typical users also cuts against a finding of direct competitiveness.

Finally, on the record presented, RENT MANAGER is a more expensive system than ZILLOW Rental Manager. As Plaintiff's system is significantly more comprehensive than Defendant's, and as Plaintiff's system attracts generally larger consumers than Defendant's, it is not surprising that Plaintiff's system commands a higher price than Defendant's. Plaintiff's product sells for either a one-time fee of $5,000–$6,000 or a monthly fee of $75 (plus a one-time activation fee of $150). (Doc. 59 at 18). Defendant's tool, on the other hand, is generally offered for free. (Doc. 70 at ¶¶ 9–10). This price difference further undercuts a finding of direct competitiveness, and further indicates that confusion between the competing systems is unlikely. *Cf. Progressive*, 856 F.3d at 432 (noting that it was "difficult to see how a prospective customer could confuse [a] [limited] 'free' service" with an "expensive and all-encompassing" one).

In light of the foregoing, while the parties' systems are certainly related, they are not directly competitive—at least not on the evidence presented to date. Under such circumstances, the second *Frisch's* factor is neutral.

### 3. *Factor three: similarity of the marks*

"Similarity of marks is a factor of considerable weight." *Daddy's*, 109 F.3d at 283. In evaluating whether marks are similar, a court should consider the marks "as they would appear in the market place." *Citizens*, 320 F. App'x at 349 (citing *Wynn*, 839 F.2d

at 1187). Accordingly, a court should consider the "pronunciation, appearance, and verbal translation of conflicting marks." *Leelanau*, 502 F.3d at 516–17 (quoting *Daddy's*, 109 F.3d at 283); *see also Progressive*, 856 F.3d at 433 (confirming that courts "are obligated to evaluate the marks as they appear in commerce—not just as they appear in black and white.").

Here, Plaintiff argues that RENT MANAGER and ZILLOW Rental Manager "are identical for the purposes of a trademark law analysis . . . ." (Doc. 58-1 at 26). Plaintiff largely bases this argument on the fact that the words "rent" and "manager" appear (in some form) in both marks.[21] (*See id.*) On review, there is no question that the parties' marks use similar words. (*See* Doc. 11 at 6; Doc. 11-4 at 2; Doc. 11-6 at 2; Doc. 11-18 at 2). But this fact, alone, is not dispositive. Under the third likelihood of confusion factor, the Court is not simply tasked with determining whether a textual resemblance exists. *Progressive*, 856 F.3d at 433. Instead, the Court tasked with deciding whether, in "light of what occurs in the marketplace," the marks will be confusing to the public when singly presented. *Wynn* 839 F.2d at 1187 (emphasis added).

When the parties' mark are viewed as they appear in commerce, several significant visual differences arise. Initially, the marks use different color schemes. Plaintiff's mark uses contrasting shades of bright orange and dull blue, whereas Defendant's mark employs a distinctive bright blue and flat white. Moreover, the marks use different logos. While Plaintiff's mark is preceded by a multi-unit apartment

---

[21] To use the words of Plaintiff's expert: "[the] name Rent Manager is contained entirely (and reproduced exactly) within . . . [the] name Zillow Rental Manager." (Doc. 60-2 at 5).

complex, Defendant's mark is paired with a "Z"-slashed residential property. These significant visual differences cut against a finding that the marks are confusingly similar. *Cf. Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998) (concluding that STREETWISE and STREETSMART were not confusingly similar as the marks used, *inter alia*, different colors and logos).

Additionally, Defendant's use of its house mark (ZILLOW) and tool name (Rental Manager) underline together in the marketplace further cuts against a finding of confusing similarity. (Doc. 70 at ¶¶ 6, 11; *accord* Doc. 60-2 at 5). The Sixth Circuit has stated in no uncertain terms that the use of "junior mark together with a house mark . . . can distinguish the [] junior mark from the senior mark and make confusion less likely." *AutoZone*, 373 F.3d at 796. And the Sixth Circuit has noted that this proposition rings "especially true" where, as here, the house mark in question (ZILLOW) is "easily recognizable and associated with a strong and popular brand . . . ."[22] *Progressive*, 856 F.3d at 433 (concluding that there was no undue similarity between the marks

---

[22] Plaintiff cites out-of-Circuit precedent for the proposition that, in a reverse confusion case, when a junior user adds its house mark to a senior user's trademark, confusion can be "even more likely." (Doc. 58-1 at 27). But, in *Progressive*, the Sixth Circuit stated the following on this matter: "While it is true that some courts have recognized that the addition of a junior user's house mark to a senior user's may create the potential for reverse confusion, . . . there is no blanket rule for all cases of reverse confusion. . . . [T]he only question that must be answered is whether there is a potential for confusion." 856 F.3d at 433 n.5. Here, the Court finds that, based on the evidence presented to date, Defendant's well-known house mark appears to supplement the significant visual differences already present between the parties' marks and thus appears to render the possibility that consumers will actually confuse the parties' marks less likely. But, of course, this finding is but a preliminary determination in the context of a preliminary Order.

"ORDERLINK" and "UPS OrderLink" based, *inter alia*, upon the presence of the "easily recognizable "UPS" house mark); (*see* Doc. 64 at 8).

Plaintiff argues that the Court should compare the terms "RENT MANAGER" and "Rental Manager" without Defendant's house mark, because some consumers "may" choose to refer ZILLOW Rental Manager by a shortened name.  (Doc. 58-1 at 28).  But the Court cannot simply disregard Defendant's house mark on the basis of such speculation.  (*Cf.* Doc. 73 at 7).  In the likelihood of confusion analysis, conflicting marks must be compared as they appear in commerce "*in their entirety*, including any 'house mark' which one party may append to its mark."  McCarthy, *supra*, at § 23:43 (emphasis added); *accord Worthington*, 732 F. Supp. at 1441.  Based on the evidence presented, Defendant's house mark always precedes its tool name in commerce.  (Doc. 70 at ¶¶ 6, 11; *accord* Doc. 60-2 at 5).  Accordingly, based on the evidence presented, Defendant's house mark is an essential consideration in any similarity analysis.[23]

---

[23] Plaintiff cites the Sixth Circuit case *Daddy's* for the proposition that it is proper to compare Plaintiff's mark (RENT MANAGER) with a shortened form of Defendant's ("Rental Manager"). (Doc. 64 at 9).  But the Court finds Plaintiff's reliance on *Daddy's* misplaced.  In *Daddy's*, the Sixth Circuit concluded that a district court had erred in failing to consider the similarity between the plaintiff's mark (DADDY'S) and various shortened forms of the defendant's mark (BIG DADDY'S FAMILY MUSIC CENTER) in its likelihood of confusion analysis.  109 F.3d at 283–84.  But importantly, the Sixth Circuit only reached this conclusion after stating explicitly that the "defendant present[ed] itself" as, *inter alia*, "Big Daddy" and "Big Daddy's" in its own promotional materials.  *Id.* at 279, 283.  Here, based on the evidence submitted this far, there is no dispute that Defendant always presents is tool as "ZILLOW Rental Manager."  (Doc. 70 at ¶¶ 6, 11; *accord* Doc. 60-2 at 5).  Thus here, it would not similarly be appropriate to consider a shortened version of the tool's name.

In the end, on the record presently before the Court, the Court cannot conclude that the parties' marks are confusingly similar. Accordingly, the third *Frisch's* factor weighs against finding a likelihood of confusion.

### 4. *Factor four: evidence of actual confusion*

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Wynn*, 839 F.2d at 1188. "Where evidence of actual confusion exists, the weight to which such evidence is entitled varies depending upon both the type and amount of confusion that occurs." *Therma-Scan*, 295 F.3d at 634 (citing *Homeowners*, 931 F.2d at 1110 (noting that "it does not follow that any type or quantum of such evidence [of actual confusion] is entitled to significant weight . . .")). Indeed, the Sixth Circuit has explained that "'the existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks may even lead to an inference than no likelihood of confusion exists.'" *Id.* (quoting *Homeowners*, 931 F.2d at 1110).

Here, Plaintiff argues that "evidence of actual confusion abounds." (Doc. 58-1 at 32). In support of this argument, Plaintiff presents the Court with evidence that, in July 2018, one of Defendant's customers erroneously contacted *Plaintiff* to ask a question about <u>Defendant's</u> tool (ZILLOW Rental Manager). (*Id.*; *see also* Doc. 60-2 at 95). Plaintiff's expert also presents the Court with a handful of posts from internet-based forums, blogs, and newsletters which wrongfully refer to Defendant's product as "ZILLOW *Rent* Manager" (instead of ZILLOW Rent<u>al</u> Manager). (Doc. 58-1 at 32–33;

*see also* Doc. 60-2 at 100; Doc. 60-3 at 1–18, 23–24).[24]  On review, the evidence

presented as to actual confusion is underwhelming.

As an initial matter, the Court does not have enough information before it to

determine whether the evidence presented is evidence of *confusion*—that is, a mistaken

belief "that the products . . . offered by the parties are affiliated in some way."

*Homeowners*, 931 F.2d at 1107.  Indeed, the fact that a single customer called the wrong

company to discuss a product, like the fact that a few posters spelled the name of a

product wrong online, could just as easily evidence <u>carelessness</u>.[25]  *See Duluth News-*

*Tribune, a Div. of Nw. Publications, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1098 (8th

Cir. 1996) (finding "evidence of misdirected phone calls and mail" to "show

inattentiveness on the part of the caller or sender rather than actual confusion"); *see also*

*Therma-Scan*, 295 F.3d at 636 (noting that it was certainly possible that a few

misdirected emails were sent out of "carelessness" rather than "confusion").

---

[24] Plaintiff's expert has additionally submitted evidence that various internet-based search engines fail to distinguish between RENT MANAGER and ZILLOW Rental Manager.  (Doc. 60-2 at 10; *see also* Doc. 60-3 at 19–20).  However, at this time, the Court finds this evidence unpersuasive.  That "'an Internet search . . . for [certain] products, . . . pulls up [products] from both [Plaintiff and Defendant], says nothing.  It is the possible confusion of *consumers* that this Court is concerned with, not whether an inanimate object like a computer, wonderful though it may be, can in generating data expressly distinguish between [Plaintiff's and Defendant's products].'"  *Konoyo Co. v. Seven for All Mankind, LLC*, No. 3:11-CV-47, 2011 WL 13233276, at *5 (S.D. Ohio Aug. 26, 2011) (quoting *Sullivan v. CBS Corp.*, No. 1:00-CV-5060, 2002, WL 554506, at *10 (N.D. Ill. Apr. 15, 2002), *aff'd*, 385 F.3d 772 (7th Cir. 2004)) (brackets and emphasis in *Konoyo*).

[25] With regard to the forum and blog posts that Plaintiff has submitted, this point resonates with particular force.  In the Court's view, it would be inadvisable to expect *anything but* <u>carelessness</u> in such contexts.

But, even if the Court assumes that the evidence presented is evidence of confusion (rather than evidence of carelessness), at this stage of the litigation, Plaintiff's showing remains *de minimus*. (Doc. 60-2 at 95, 100; Doc. 60-3 at 1–18, 23–24). There is no dispute that the parties' marks have coexisted in the marketplace since 2016. (Doc. 59 at 6–7; Doc. 70 at ¶ 9). Further, there is no dispute that, since 2016, the parties have engaged in numerous consumer interactions. (*See, e.g.*, Doc. 39 at ¶ 13; Doc. 70 at ¶ 27). If after all those years and all those interactions, only a <u>single</u> caller and a <u>few</u> posters have confused the parties' products, a natural inference would appear to arise—that confusion is unlikely in the vast majority of the parties' consumers.[26]

Such an inference finds support in applicable precedent. *See Therma-Scan*, 295 F.3d at 634; *see also Progressive*, 856 F.3d at 434 (noting that a "'company's failure to uncover more than a few instances of actual confusion creates a presumption against likelihood of confusion in the future' when there are so many opportunities for confusion to occur" (quoting *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 399 (4th Cir. 2009)); *cf. S. C. Johnson & Son, Inc. v. Johnson*, 266 F.2d 129, 141 (6th Cir. 1959) ("The owner of a trademark is not entitled to a guarantee against confusion in the minds of careless and indifferent buyers . . . ; and merely occasional cases of confusion or thoughtless errors by very inattentive purchasers are of very little significance in trademark and unfair competition cases.").

---

[26] This point is bolstered by the fact that the single caller and few posters constitute a small fraction of ZILLOW Rental Manager's monthly users. (Doc. 39 at ¶ 13).

In sum, despite numerous consumer interactions, there is little (if any) evidence of actual confusion before the Court.[27]  As such, on the evidence presented, the fourth *Frisch's* factor weighs against finding a likelihood of confusion.

### 5.  *Factor five: the intent of defendant in selecting the mark*

"If a party chooses a mark with the intention of creating confusion between its products and those of another company, 'that fact alone may be sufficient to justify an inference of confusing similarity.'"  *Therma-Scan*, 295 F.3d at 638 (quoting *Daddy's*, 109 F.3d at 286).  "Circumstantial evidence of copying, particularly the use of a contested mark with knowledge that the mark is protected, may be sufficient to support an inference of intentional infringement where direct evidence is not available."  *Progressive*, 856 F.3d at 436 (citing *Therma-Scan*, 295 F.3d at 638–39).  Nevertheless, "knowledge of a trademark, alone, will not support a finding of intent to confuse if other circumstances show that the defendant believed there was no infringement."  *Id.*

Here, Plaintiff argues that intentional infringement exists.  (Doc. 42 at 12–13).  Plaintiff bases this argument on the fact that Ms. Place, one of the marketing team

---

[27] Defendant's expert has proffered testimony on the issue of actual confusion.  (*See* Doc. 62-1).  Defendant's expert testifies that no actual confusion exists in this case based upon his administration of an Everready survey.  (*Id.* at 30; Doc. 62 at 66).  On review, the Court does not find Defendant's expert's testimony particularly helpful—at least, not at this juncture.  This is because Defendant's expert indisputably designed his survey to test for *forward* confusion, (Doc. 62 a 66), and Plaintiff has averred that *forward* confusion is not the type of confusion at issue in this PI Motion.  (*See* Doc. 58-1 at 24 (asserting that, as Defendant's expert's survey only tested for "forward confusion," Defendant's expert's survey "would not detect the type of confusion that is likely to occur in this case"); *see also id.* at 23 (stating that this case "includes 'reverse confusion'") (emphasis added)); *see generally Wreal, LLC v. Amazon.com, Inc.*, No. 1:14-CV-21385, 2016 WL 8793317, at *12 (S.D. Fla. Jan. 7, 2016) (setting forth the specifics of an Everready survey designed to test for confusion in a reverse confusion case).  Accordingly, the Court will not assign Defendant's expert's testimony much weight for the purposes of this Order.

members Defendant charged with naming ZILLOW Rental Manager, knew about Plaintiff (and, by extension, its mark) prior to ZILLOW Rental Manager's branding discussions. (*Id.* at 12 (noting that Ms. Place had previously worked with Plaintiff on certain "webinars and business opportunities")). On review, the evidence presented does establish that Defendant was *aware* of Plaintiff's product when it named its own. However, knowledge alone is not sufficient to support a finding of intent to confuse when other circumstances show that Defendant believed there was no infringement. *Progressive*, 856 F.3d at 436.

Here, the evidence presented suggests that Defendant selected the name "ZILLOW Rental Manager" with the intent of describing its product and leveraging the value of its house mark, not with the intent of either infringing upon or causing confusion with Plaintiff's mark. (Doc. 70 at ¶ 17; Doc. 72 at ¶¶ 4–5). Moreover, the evidence presented establishes that Defendant only selected the name ZILLOW Rental Manager after receiving assurances from its legal team that the name was highly descriptive and, as a result, incapable of infringement. (Doc. 39 at ¶¶ 18–19); *Aero-Motive Co. v. U.S. Aeromotive, Inc.*, 922 F. Supp. 29, 44 (W.D. Mich. 1996) (noting that courts have "held that reliance on the advice of counsel will support a finding that a defendant acted without the intent to infringe on the trademark of another").

Finally, while the Court is not impressed that Defendant decided to rebrand its tool without the due diligence of running a trademark search, (Doc. 39 at ¶¶ 18–19; Doc. 61 at 125), the Court cannot conclude that this failure alone amounts to an act of intentional infringement. *See, e.g.*, *Perfetti Van Melle USA v. Cadbury Adams USA LLC*, 732 F.

Supp. 2d 712, 724 (E.D. Ky. 2010) ("[T]he fact that a routine trademark search would have alerted [the defendant] to the existence of [the plaintiff]'s products fails to bolster [the plaintiff]'s argument [that the defendant committed intentional infringement] as mere knowledge of a competitive product does not support an inference of intentional copying." (citing, *inter alia*, *Daddy's*, 109 F.3d at 286–87)).

On the evidence presented, Defendant's selection of "ZILLOW Rental Manager" appears to be the product of descriptive branding rather than bad faith.  Thus, on the evidence presented, the Court cannot find that intentional infringement exists.  In light of the foregoing, the fifth *Frisch's* factor is neutral.  *Leelanau*, 502 F.3d at 520 ("[Intent] is an issue whose resolution may benefit only the cause of the senior user, not of an alleged infringer." (citation omitted)).

### 6.  *Factor six: marketing channels used*

When considering the marketing channels used, courts must determine "'how and to whom the respective goods or services of the parties are sold.'"  *Leelanau*, 502 F.3d at 519 (quoting *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 357 (6th Cir. 2006)).  "There is less likelihood of confusion where the goods are sold through different avenues."  *Id.*  "Where the parties have different customers and market their goods or services in different ways, the likelihood of confusion [also] decreases." *Therma-Scan*, 295 F.3d at 636.

Here, the record before the Court indicates that there is a substantial degree of overlap with regard to how the parties market their systems.  Both parties market their systems, *inter alia*, through search engine optimization, via online- and print-based

advertisements, and at trade shows. (Doc. 59 at 17; Doc. 30-4 at 11, 14). Defendant correctly notes that there are some differences with regard to how the parties actually <u>sell</u> their systems. To access Plaintiff's product, a consumer must call Plaintiff and speak with a sales rep. (Doc. 59 at 17). To access Defendant's tool, a consumer must sign up for a ZILLOW account online. (Doc. 70 at ¶¶ 11–12, 23). But, when all of the evidence presented is considered, the sixth *Frisch's* factor does weigh in favor of finding a likelihood of confusion.

### 7. *Factor seven: likely degree of purchaser care*

"Generally, the standard for determining whether a likelihood of confusion would arise is predicated upon an ordinary buyer exercising ordinary caution." *Progressive*, 856 F.3d at 435. "However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper." *Homeowners*, 931 F.2d at 1111. So, for example, when the relevant buyer class primarily includes individuals who are purchasing business services, the level of sophistication is higher and the likelihood of confusion is lower. *Progressive*, 856 F.3d at 435.

Here, the evidence presented strongly suggests that the parties' consumers will employ a high degree of care. To make effective use of either party's product, a consumer must have purchased property for rent and be ready to engage in the rental business. (*Cf.* Doc. 2-2 at ¶ 4; Doc. 70 at ¶ 9). In the Court's view, any person who has made such a substantial investment in property will, regardless of whether he/she is a large property manager or an amateur landlord, likely exercise above-average care in selecting the tools used in connection with his/her rental. *Accord Homeowners.*, 931 F.2d

at 1111 (noting that various individuals connected to the real estate industry would likely exercise a high degree of care).  Accordingly, the seventh *Frisch's* factor presently weighs against a finding of likelihood of confusion.

### 8.  *Factor eight: likelihood of expansion of the product lines*

 "[A] 'strong possibility' that either party will expand [its] business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing."  *Id.* at 1112 (citation omitted).  "Expansion could be geographic or an increase in products or services."  *Gen. Motors*, 453 F.3d at 358 (citing *Daddy's*, 109 F.3d at 287).

Here, the parties have submitted evidence regarding the possibility of ZILLOW Rental Manager's expansion under seal.  (*See* Doc. 42 at 13–14 (referencing sealed documents); Doc. 45 at 13–16 (same)).  The Court has carefully reviewed the evidence submitted, but, given its sealed nature, the Court will not discuss it in detail herein. Suffice it to say that, while much of the evidence submitted is equivocal, the eighth *Frisch's* factor does weigh in favor of finding a likelihood of confusion. (*See* Doc. 30 at 82–85; Doc. 43-8 at 3; Doc. 43-10 at 2; Doc. 43-11 at 2; *but see* Doc. 39 at ¶ 9).

### 9.  *Final conclusion: balancing the* **Frisch's** *factors*

With all the *Frisch's* factors considered, the Court must now balance them.  To summarize the foregoing, based upon the evidence presented: the sixth and eight factors weigh in favor of a likelihood of confusion; the first, third, and fourth, factors weigh against a likelihood of confusion; and the remaining factors are neutral.  Balancing all of the *Frisch's* factors, the Court cannot conclude that Plaintiff has established a <u>strong</u>

likelihood of success on the merits of its claims.  *Hall*, 878 F.3d at 527.  Accordingly, the Court concludes that, at this juncture, the first preliminary injunction factor weighs against the issuance of injunctive relief.

### B.  Irreparable Harm

The second preliminary injunction factor is whether the moving party will suffer irreparable harm if the injunction is not issued.  To demonstrate irreparable harm, the plaintiff must show that it will suffer harm that is "actual and imminent" rather than "speculative or unsubstantiated."  *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).  Harm is not irreparable if it is fully compensable by monetary damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

Here, Plaintiff argues that irreparable harm exists because irreparable harm is ordinarily presumed in trademark infringement cases.  (Doc. 58-1 at 35 (citing *PGP, LLC v. TPII, LLC*, 734 F. App'x 330, 334 (6th Cir. 2018))).  But where, as here, a plaintiff "has failed to show a likelihood of success on the merits, irreparable injury is not presumed."  *PGP*, 734 F. App'x at 334 (citing *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991)).

Plaintiff also argues that irreparable harm exists because Defendant's actions are causing confusion, and confusion harms Plaintiff's brand, mark, and financial interests. (Doc. 58-1 at 35).  But, as the Court stated in section III.A.4 *supra*, Plaintiff has not presently presented anything more than *de minimus* evidence of actual confusion.  And, on the Court's review of the evidence submitted, Plaintiff has not presently presented any hard proof of financial harm.  (*Cf.* Doc. 28 at 20–21, 30).  "Unsubstantiated allegations of

irreparable harm are an insufficient basis upon which to grant [a] plaintiff injunctive relief." *FirstPower Grp. LLC v. WD-40 Co.*, No. 5:17-CV-392, 2017 WL 3034499, at *13 (N.D. Ohio July 18, 2017).

All things considered, the second preliminary injunction factor weighs against the issuance of injunctive relief.

### C. Harm to Others

The third preliminary injunction factor is whether granting the injunction would cause harm to others. "The irreparable injury [the plaintiff] will suffer if [its] motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting of injunctive relief." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

Here, as detailed in section III.B *supra*, Plaintiff has not presently shown that it will suffer irreparable harm absent an injunction. (*Cf.* Doc. 28 at 20–21, 30). In contrast, Defendant has come forward with evidence that rebranding ZILLOW Rental Manager would be costly. (Doc. 70 at ¶¶ 31–32). On such facts, the Court concludes that the second preliminary injunction factor weighs against the issuance of injunctive relief.

### D. Public Interest

The final preliminary injunction factor is whether granting the injunction would harm the public interest. The public has a strong interest in preventing consumer confusion. *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 383 (6th Cir. 2006). But, where there is "no likelihood of confusion, an injunction is not in

the public interest." *RGH Enters., Inc. v. Soporex Respiratory, Inc.*, No. 5:07-CV-3486, 2008 WL 11381818, at *10 (N.D. Ohio Sept. 19, 2008).

Here, as Plaintiff has not established that it is likely to prevail on the merits of its claims, the Court cannot assume that a likelihood of consumer confusion exists at this time. Accordingly, for now, the issuance of an injunction will not advance the public interest. The final preliminary injunction factor weighs against the issuance of injunctive relief.

## IV.  CONCLUSION

As each of the preliminary injunction factors weighs against the issuance of injunctive relief, the Court concludes that Petitioner's PI Motion (Doc. 58) must be and is hereby **DENIED**.[28]

**IT IS SO ORDERED.**

Date:  9/8/2020

Timothy S. Black
United States District Judge

---

[28] As the Court has denied Plaintiff's PI Motion (Doc. 58), the Court also **TERMINATES** the sealed version of Plaintiff's PI Motion (Doc. 27) as **MOOT**.